IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

POLLY A. HUBER                                                                          PLAINTIFF

v.                            Civil No. 04-2235

JO ANNE B. BARNHART, Commissioner,
Social Security Administration                                        DEFENDANT

## **MEMORANDUM OPINION**

Plaintiff Polly A. Huber brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration denying her application for disability insurance benefits (DIB) under the provisions of Title II of the Social Security Act.

**Procedural Background:**

Huber protectively filed her application for DIB on February 3, 2000. (Tr. 86-91, 97). She alleged a disability onset date of December 13, 1999, due to a broken left collarbone, left shoulder impairment, breast cancer, diabetes, and arthritis. (Tr. 15, 86-91, 97). During the administrative hearing, she amended her disability onset date to December 15, 1998. (Tr. 15, 43).

An administrative hearing was held on March 26, 2001. (Tr. 28-63). Huber testified and was represented by counsel. (Tr. 34-55, 28). Clyde Petate, a vocational expert, also testified. (Tr. 55-61).

By written decision dated June 26, 2001, the administrative law judge (ALJ) found that, although severe, Huber's impairments did not meet or equal the criteria of any of the impairments listed in Appendix I, Subpart P, Regulations No. 4 (Tr. 16). After discrediting Huber's subjective

allegations, the ALJ concluded that she maintained the residual functional capacity (RFC) to engage in a full range of light duty work. (Tr. 17).

Due to the exertional levels of her past work, the ALJ concluded she was unable to perform her past relevant work. (Tr. 18). Utilizing the Medical-Vocational Guidelines found in Appendix 2 to Subpart P of Regulation No. 4, the ALJ concluded Huber's RFC and vocational profile coincided with the criteria of Rule 202.11 which mandated a finding of no disability. (Tr. 18).

Huber appealed the decision of the ALJ. (Tr. 11 ). The decision of the ALJ became the final decision of the Commissioner when the Appeals Council denied Huber's request for review. (Tr. 7-10).

**Evidence Presented:**

At the March 26, 2001, hearing before the ALJ, Huber testified she was fifty-four years old and had dropped out of high school in the 11th grade. (Tr. 34). She has four children. (Tr. 37). She lives with her husband and youngest son who is twenty-seven. (Tr. 37).

Her husband is disabled. (Tr. 37). He has chronic obstructive pulmonary disease (COPD) and degenerative arthritis of the spine. (Tr. 37). He is not bedridden but can't do very much at all. (Tr. 37). He can wash, dress, and feed himself. (Tr. 38). She does not have to lift him. (Tr. 38).

She received training as a nurse's aid through the Agency on Aging. (Tr. 34). She worked as a certified nursing assistant (CNA) for almost twenty years. (Tr. 36).

Huber worked for three years in a factory making wire harnesses. (Tr. 58-60). In this job, she pulled wires and assembled them by putting terminals on the ends of the wires. (Tr. 59).

She also worked at home as an assembly worker making fishing lures. (Tr. 38). She would pick up her supplies at the company, do the lures at home, and then take the lures back to

the company. (Tr. 38). She was required to lift trays of fishing lures. (Tr. 38-39). She carried between forty and fifty pounds of the trays in and out. (Tr. 39). She did this at night when she was working as an aid. (Tr. 38).

After she had her mastectomy in August of 1997, Huber testified she had difficulty doing the fishing lures. (Tr. 40, 48). Her left elbow and wrist became swollen. (Tr. 40).

Huber testified she stopped working as a CNA in August of 1997. (Tr. 42). In 1998, she worked at home with the fishing lures. (Tr. 42). She stopped working with the fishing lures after she had pancreatitis in December of 1998. (Tr. 42). She did not work again until December of 1999, when she took some lures home and tried just to see if she could do it but her arm got so swollen that was the last time she worked. (Tr. 41).

She indicated she had tried to work but just couldn't "hold up." (Tr. 34). She stated it was painful and her legs and arms were just weak. (Tr. 34-35). She testified she cannot lift with her left arm or hold it in an extended position without resting it on something. (Tr. 35 & 50). She doesn't lift anything heavier than dishes such as a plate, cup, or glass with her left hand. (Tr. 52). She might be able to lift five pounds with her right hand but she doesn't think she could do it repetitively. (Tr. 53).

She has pain in her left shoulder and underneath the arm. (Tr. 50). Sometimes, when she bends over there is a stinging searing pain underneath it. (Tr. 50 & 53). She can pick up smaller items but cannot grasp and hold onto the items for any period of time. (Tr. 51). She also has pain in her legs from the knees down. (Tr. 49-50). She sometimes has pain in her back. (Tr. 49).

She testified if she sits for very long she squirms a lot and usually has to get up and down. (Tr. 51). She can only stand for five or ten minutes if she does not have something to hold onto or lean against. (Tr. 51). She can walk about 500 feet before she has to stop and rest. (Tr. 52).

-3-

Huber indicated she had hurt her left shoulder in an automobile accident in 1993 and then when she had a mastectomy they took the muscle on her left side. (Tr. 35). She stated she is unable to raise her left arm above her head without holding it. (Tr. 35). She can raise it far enough to place her left hand on top of her hair but can't hold it there very long. (Tr. 36).

With respect to her daily activities, Huber testified that she gets her insulin out of the refrigerator when she gets up so it can be warming up for a shot. (Tr. 44). She fixes breakfast, does the dishes, and the rest of the day she just "piddles" around the house." (Tr. 44). She does her own housework. (Tr. 44). She has no hobbies or social life other than watching her grandchildren play ball. (Tr. 51).

She works hard at controlling her diabetes. (Tr. 44). Every since she started chemotherapy, Huber testified her legs have just been really weak. (Tr. 44). She stated she didn't know if that's compounded by the diabetes but when she tries to squat down she cannot get back up. (Tr. 44). It is from her knees down. (Tr. 44). To get back up, she has to crawl to the nearest chair, table, or anything she can pull herself up on. (Tr. 54).

If she hangs onto something with her right hand, she has no problem going up stairs. (Tr. 54). However, Huber testified she cannot carry items up the stairs. (Tr. 54).

Huber tries to exercise her legs by constantly moving them. (Tr. 44). She also walks around her house when the weather permits. (Tr. 45).

Huber indicated she cannot lift. (Tr. 45). And doing the repetitive assembly work on the fishing lures put strain on her wrist and elbow. (Tr. 46). Huber indicated her arm and elbow are always swollen. (Tr. 46).

She takes Tylenol for the pain. (Tr. 46). She indicated there are a lot of pain medications she cannot take because of the other medications she is on. (Tr. 47). These include high blood

-4-

AO72A
(Rev. 8/82)

pressure medicine, Humulin, and Evista for cancer therapy. (Tr. 47). She also has an allergic reaction to anything with codeine or Darvocet. (Tr. 49).

She can drive. (Tr. 47). She usually goes to the store with one of her daughters. (Tr. 47). She does the laundry, the cooking, and housework. (Tr. 47-48). Huber testified her energy level is poor and she has a lot of tiredness and fatigue. (Tr. 50).

Clyde Petate, a vocational expert, was called to testify. (Tr. 55-61). Petate testified the nurse's aid position would be classified as medium work, SVP four, which is semi-skilled. (Tr. 56). However, he suspected it was closer to heavy. (Tr. 56). Huber's work as an assembler was classified as unskilled and medium. (Tr. 60). Huber's work with fishing lures was classified as sedentary or light. (Tr. 60). Petate indicated Huber did not acquire any transferable skills. (Tr. 61).

The record contains the following medical and vocational evidence. In August of 1997, it was discovered Huber had infiltrating ductal carcinoma of the left breast. (Tr. 130). On August 21, 1997, Dr. David Hunton performed a left modified radical mastectomy on Huber. (Tr. 130-131).

On November 13, 1997, note was made of the fact that x-rays showed degenerative changes of Huber's thoracic and lumbar spine. (Tr. 200-201). The x-rays were taken in response to abnormal areas noted on a bone scan taken on August 22, 1997. (Tr. 200).

AO72A
(Rev. 8/82)

Following the surgery, Huber "completed six months of CAF[1] chemotherapy." (Tr. 193). She was then started on Tamoxifen.[2] (Tr. 193).

On February 5, 1998, at the request of Dr. John D. Wells a cardiac ejection fraction test was done on Huber. (Tr. 124). Her ejection fraction was calculated at 57% which was within normal limits and unchanged from a prior study. (Tr. 124).

On February 9, 1998, note was made that Huber was doing very well on chemotherapy and denied having any chest pain, shortness of breath, headache, nausea, or vomiting. (Tr. 160). It was also noted that she had hypertension. (Tr. 160).

On December 13, 1998, Huber was admitted to St. Edward Mercy Medical Center complaining of abdominal pain, nausea and vomiting. (Tr. 132). Dr. Emad Al-Ghussain diagnosed Huber as having acute pancreatitis probably related to Tamoxifen; metabolic acidosis related to pancreatitis and diabetes mellitus that has resolved; diabetes mellitus probably related to acute pancreatitis; hypertriglyceridemia probably made worse by Tamoxifen; history of hypertension; cancer of the breast status post surgery and chemotherapy. (Tr. 133). She was discharged on December 21, 1998. (Tr. 132).

Huber had a follow up visit with Dr. Al-Ghussain on December 28, 1998, and denied having any problems. (Tr. 151). She was continued on her medications and a note was made that she would follow up with Dr. Paul Howell, the endocrinologist. (Tr. 151). She was instructed to

---

[1] CAF stands for the initials of the drugs involved in this type of chemotherapy. The drugs are cyclophosphamide, doxorubicin, and fluorouracil. *See e.g.,* www.chemotherapy-info.com/caf.htm

[2] Tamoxifen is an anti-estrogen treatment recommended for its ability to reduce the risk of recurrence of the same cancer and to reduce the risk of developing a new cancer in the same or other breast. *See* www.breastcancer.org/tre_opts_oviewopt.html

AO72A
(Rev. 8/82)

hold off the Tamoxifen until she saw Dr. Howell. (Tr. 152). Allergies to codeine and Darvocet were noted. (Tr. 153).

Dr. Howell believed the pancreatitis was possibly secondary to Tamoxifen. (Tr. 185). She had completed ten months of it and stayed off it two months and then was started on Evista to be taken daily for a total of five years. (Tr. 185 & 177).

On January 4, 1999, Huber was seen by Dr. Howell. (Tr. 188). He noted she had been diagnosed with type II diabetes mellitus while hospitalized. (Tr. 188). Her diabetes was being controlled with insulin. (tr. 188).

On February 15, 1999, Huber was seen by Dr. Howell. (Tr. 186). He noted Huber's diabetes was well controlled and her cholesterol and triglycerides were at excellent levels. (Tr. 186). Huber indicated she was feeling great. (Tr. 186). An attempt was made to change Huber form IV insulin therapy to an oral agent, Glucophage. (Tr. 187).

On March 19, 1999, Huber was seen by Dr. Howell for a follow-up after having been started on Glucophage the previous month. (Tr. 178). Huber reported not tolerating it well and didn't believe it was helping her much. (Tr. 178). However, she felt well, voiced no complaints, and her blood sugars had been well controlled. (Tr. 178). She had no real complaints of any kind. (Tr. 178). She noted she had a slight cough with Monopril so she was changed to Cozaar. (Tr. 179).

On July 15, 1999, Huber was seen by Dr. Howell. (Tr. 182). It was noted that her blood sugars were good. (Tr. 182). Huber reported no complaints and indicated she was feeling great. (Tr. 182). Dr. Howell on physical examination noted that Huber had a little bit of swelling in her right elbow that she had not mentioned. (Tr. 182). When asked, Huber indicated her job was

AO72A
(Rev. 8/82)

lifting heavy objects on a consistent basis. (Tr. 182). Dr. Howell's diagnostic impression was: "right elbow pain consistent with medial epiconcylitis." (Tr. 183).

A mammogram on November 22, 1999, showed no evidence of malignancy. (Tr. 176).

On March 19, 2000, Dr. Wells noted that Huber was continuing on Evista and there was no evidence of cancer. (Tr. 177). He indicated she was asymptomatic. (Tr. 177).

On April 25, 2000, a physical residual functional capacity assessment was completed by Dr. Linda H. Green, a medical consultant. (Tr. 162-169). With respect to exertional limitations, it stated Huber could occasionally lift or carry fifty pounds; could frequently lift or carry twenty-five pounds; could stand and/or walk about six hours in an eight-hour workday; could sit about six hours in an eight-hour workday; and her ability to push and pull was unlimited, other than as shown for lift and/or carry. (Tr. 163). No postural, manipulative, visual, communicative, or environmental limitations were established. (Tr. 164-166).

On April 26, 2000, Doug Raines, a case consultant, concluded Huber retained the RFC to perform a full range of medium work. (Tr. 106). As such, he indicated Huber could return to her past work as a home attendant as that work is routinely performed in the national economy. (Tr. 106).

On May 1, 2000, records indicate Huber was seen by Dr. Howell on a follow-up visit. (Tr. 171-172). Office notes indicate she was feeling well and doing well. (Tr. 171). Note was made that her blood sugars were staying quite well controlled and she was having no symptoms and no problems with her feet. (Tr. 171). Note was made that her energy level was good. (Tr. 171).

On July 12, 2000, Huber filled out a disability supplemental interview outline. (Tr. 111-115). She listed her weight as 165 and height as 5'5". (Tr. 111). She indicated she had completed the tenth grade and part of the eleventh grade in high school. (Tr. 114).

-8-

She indicated she could bathe, dress, and with a little trouble take care of her own hair care needs. (Tr. 111). She indicated she could do laundry, dishes, change sheets, vacuum/sweep, take out the trash, sometimes mow the lawn with a riding mower, and could rake leaves and do garden work. (Tr. 111). She stated she could not do home repairs, repair appliances, repair the car, or wash the car. (Tr. 111).

She stated she could shop for groceries or clothes, do the banking, and go to the post office. (Tr. 111). However, she stated she could not carry items. (Tr. 111). She stated she prepared meals twice a week including sandwiches, frozen dinners, meats, vegetables, and dishes that requires a recipe. (Tr. 112). She indicated both she and her husband were on restricted diets and cooked as little as possible. (Tr. 112). She indicated it took her an hour or so to prepare a meal and took longer since her disability began. (Tr. 112).

She indicated she could pay bills, use a check book, and count change. (Tr. 112). She stated she could drive but doesn't do it very much because her daughters usually take her shopping. (Tr. 112).

She did not use any assistive devices. (Tr. 112). She spends her time reading, walks about thirty minutes a day to keep her blood sugar down, and does some crocheting. (Tr. 112). Huber indicated her disability interfered with her ability to work because she can't lift people anymore, can't stoop over or squat down without crawling over to something to pull herself back up. (Tr. 112). She indicated her legs had been very weak since she underwent chemotherapy. (Tr. 112).

She indicated she suffers from unusual fatigue and has to rest twice or more a day for at least thirty minutes to an hour. (Tr. 113). She described her left arm as being very weak from having fractured her shoulder in 1993 and having muscle removed during a mastectomy in 1997.

-9-

(Tr. 113 & 115). She indicated the shoulder and collar bone did not heal properly and it was still painful. (Tr. 113). She stated she has pain in her shoulders, neck, elbows, knees, feet, and back. (Tr. 113). She indicated her pain was worse since her diabetes set in. (Tr. 113). She indicated she was in pain almost continually. (Tr. 113 & 115).

Moving her arms continually, attempting to lift, walking up steps or inclines all cause her to have pain. (Tr. 113). She stated she gets very weak at times and tires very easily. (Tr. 115). She indicated her legs get very weak and have been doing so since she had chemotherapy. (Tr. 115).

She stated it made no difference if she was standing, walking, or sitting, the pain was there regardless. (Tr. 113). She stated nothing but medication made the pain better. (Tr. 121).

Since her disability began, Huber indicated she just can't do things she would like to. (Tr. 114). She indicated it was very frustrating and some things were too personal to mention but a lot of things had changed. (Tr. 114). On an average day, Huber indicated she tried to take care of her home and her disabled husband. (Tr. 114). While it wasn't much, Huber stated she went at it in intervals. (Tr. 114).

She stated that there are times when her blood sugar level falls and she has to come to a complete stop for at least half an hour and have something sweet. (Tr. 115). Huber indicated that it affected her eyes terribly. (Tr. 115).

On March 21, 2001, Dr. Al-Ghussain noted that Huber had been treated for breast cancer, hypertension, pancreatitis, diabetes mellitus, and anxiety. (Tr. 219). On August 29, 2001, Dr. Hunton completed a physical residual functional capacity evaluation on Huber. (Tr. 220-222). He indicated Huber could sit, stand, and walk, a total of ten to thirty minutes at one time. (Tr.

-10-

220).  He stated she could sit two hours total in an eight hour day, stand ten to thirty minutes total in an eight hour day, and walk a total of two hours in an eight hour day.  (Tr. 220).

Dr. Hunton indicated Huber could occasionally lift and carry up to five pounds.  (Tr. 220).  Her use of her feet for repetitive movements was not limited.  (Tr. 221).  Use of her left hand for repetitive movements was limited with respect to grasping and fingering.  (Tr. 221).

Dr. Hunton indicated Huber could occasionally bend, squat, reach, stoop, and crouch but could never crawl or climb.  (Tr. 221).  He stated she should never be around unprotected heights or moving machinery, and had marked limitations in being exposed to changes in temperature and humidity and in exposure to dust, fumes, and gases.  (Tr. 221).  He indicated she had moderate limitations in being exposed to vibrations.  (Tr. 221).  Dr. Hunton indicated his restrictions were related to a combination of impairments including: breast cancer; hypertension; pancreatitis, diabetes and anxiety.  (Tr. 222).  He states special emphasis should be given to her fatigue and weakness secondary to her continuing and prolonged chemotherapy.  (Tr. 222).

**Applicable Law:**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002).  The court's review includes new evidence considered by the Appeals Council "that relates to the period before the date of the ALJ's decision." *Cunningham v. Apfel*, 222 F.3d 496, 500 (8th Cir. 2000)(*citing* 20 C.F.R. § 404.970(b)).  *See also Mackey v. Shalala*, 47 F.3d 951, 953 (8th Cir. 1995)(noting that the Eighth Circuit, unlike some other circuits, does consider "tardy evidence" in the "substantial evidence equation.").  "[W]e do not evaluate the Appeals Council's decision to deny review, but rather we determine whether the record as a whole, including the new evidence, supports the ALJ's determination."  *Cunningham*, 222 F.3d at 500.

AO72A
(Rev. 8/82)

Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an

-12-

impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. *See* 20 C.F.R. §§ 404.1520, 416.920. Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §§ 404.1520, 416.920.

**Discussion**:

In this case, plaintiff argues that the ALJ erred in a number of respects. First, she argues the ALJ failed to fully develop the record. Second, Huber argues the ALJ improperly discredited her subjective complaints. Third, she contends the ALJ inaccurately determined her RFC. Finally, she contends the ALJ improperly applied the Medial-Vocational Guidelines. Huber contends this case warrants, at the very least, remand for a correct analysis. We agree.

Huber argues the ALJ failed to fully develop the record. Specifically, Huber argues the ALJ should have ordered a consultative examination. She notes that most of the records in this case are from her oncologist and endocrinologist who have monitored her chemotherapy and diabetes. Huber maintains that she did not discuss the limitations on her ability to use her left arm caused by her previous car accident or residuals of her mastectomy with these physicians. She maintains she should have been examined by a physician who could evaluate the strength, range of motion, and overall usefulness of her left arm.

The ALJ had a duty to fully and fairly develop the record even when a claimant has an attorney. *Freeman v. Apfel,* 208 F.3d 687, 692 (8th Cir. 2000). This duty includes an obligation to ensure the record contains evidence from the treating physician, or at least an examining physician, regarding the impairments at issue. *Strongson v. Barnhart*, 361 F.3d 1066, 1071-72

(8th Cir. 2004). A consultative examination must only be ordered when it is necessary for the ALJ to make an informed decision. *Freeman*, 208 F.3d at 692.

While we would not remand this case solely because the ALJ did not order a consultative examination, for the reasons discussed below, we believe remand is necessary. Upon remand, the ALJ may want to consider ordering a consultative examination or obtaining physical residual functional capacity evaluations from Huber's treating physicians.

Huber next argues the ALJ failed to properly evaluate her subjective complaints of pain. In disability determinations, credibility assessments are the province of the ALJ. *Onstead v. Sullivan*, 962 F.2d 803, 805 (8th Cir. 1992). This court will not substitute its judgment for that of the trier of fact, *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996), nor will we disturb the decision of any ALJ who seriously considers, but for good reason explicitly discredits, a claimant's testimony of disabling pain. *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993).

In this case, although the ALJ's decision recited the factors that must be considered in evaluating a claimant's allegations of disabling pain, we believe the ALJ failed to properly evaluate the factors. In evaluating a claimant's allegations, the ALJ must consider the objective medical evidence; the claimant's prior work history; the claimant's daily activities; the duration, frequency and intensity of pain; the dosage, effectiveness and side effects of medications; precipitating and aggravating facts; and functional restrictions. *Bowman v. Barnhart*, 310 F.3d 1080, 1083 (8th Cir. 2002)(*citing Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)). Here, the ALJ discounted Huber's subjective complaints primarily because her daily activities were inconsistent with the chronic pain, fatigue, and disability she testified to. (Tr. 17). "A claimant 'need not prove that [her] pain precludes all productive activity and confines [her] to life in front of the television'

-14-

in order to prove [her] disability." *Ellis v. Barnhart*, 392 F.3d 988, 999 (8th Cir. 2005)(citations omitted).

In discussing Huber's daily activities, the ALJ failed to note that in completing her supplemental interview outline Huber qualified her ability to do many activities. (Tr. 111-115). For instance, while she said she could drive, she indicated she didn't drive very much and her daughters usually took her shopping. (Tr. 112). Additionally, although she said she took care of her own personal needs including bathing, dressing and hair care, she noted she had difficulty with hair care. (Tr. 111). With respect to grocery shopping, she indicated she could not carry the groceries. (Tr. 111). She also indicated she could not stoop over or squat down without crawling over to something to pull herself back up. (Tr. 112). She noted her legs had been very weak since she started chemotherapy. (Tr. 112). She indicated she suffered from unusual fatigue and had done so since 1997 and was in pain constantly. (Tr. 113). Finally, she indicated she had to go at the household chores in intervals. (Tr. 114).

Her hearing testimony also bore out the limited nature of her daily activities and underscored the existence of her chronic pain, weakness, and fatigue. The medical records indicate that following the discovery that Huber had breast cancer she underwent a mastectomy and then six rounds of CAF chemotherapy, ten months of Tamoxifin therapy, followed by five years of Evista therapy. Despite this, there was no discussion of how this significant and lengthy cancer treatment would affect her stamina or any discussion on how the side effects from the medication could impact her ability to do work related activities. We believe remand is necessary for further evaluation of Huber's allegations of disabling pain.

With respect to her RFC, she contends the weakness and limited motion in her left arm coupled with her generalized fatigue and weakness preclude her from lifting the twenty pounds

-15-

light work requires. She points out that her surgeon, Dr. Hunton has specifically limited her to lifting and carrying no more than five pounds. (Tr. 220). "'[L]ight work' is generally characterized as (1) lifting or carrying ten pounds frequently; (2) lifting twenty pounds occasionally; (3) standing or walking, off and on, for six hours during an eight-hour workday; (4) intermittent sitting; and (5) using hands and arms for grasping, holding, and turning objects." *Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001) (*citing* 20 C.F.R. § 404.1567(b); Social Security Ruling 83-10).

In this case, the ALJ did not have the benefit of Dr. Hunton's physical residual functional capacity evaluation when the ALJ rendered his decision. However, the material was before the Appeals Council. Huber testified to significant limitations on her physical abilities due not only to pain from her arm and shoulder secondary to an motor vehicle accident and a mastectomy but also to chronic fatigue and weakness as a result of her chemotherapy and diabetes. The medical records consist almost entirely of records from her oncologist and endocrinologist. These records are concerned with her response to the chemotherapy and whether her diabetes was under control. Other than Dr. Hunton's assessment, there are no records from any medical personnel who had examined Huber and made any assessment of her ability to perform work related functions. Thus, this issue needs to be developed.

For the reasons stated, we believe remand is necessary in this case. The record needs to be developed with respect to Huber's ability to perform a full range of light work, any side effects from the medication she is on, and her allegations of disabling pain. The Commissioner may want to consider obtaining a residual physical functional capacity assessment from her treating physicians and/or obtain a consultative examination. The Commissioner should also obtain additional information, through interrogatories or another hearing, from a vocational expert.

AO72A
(Rev. 8/82)

**Conclusion**:

For the reasons stated, the court finds that the decision of the Commissioner denying benefits to the plaintiff should be reversed and the case remanded to the Commissioner. A separate judgment in accordance with this opinion will be entered.

Dated this 3rd day of February 2006.

/s/ Beverly Stites Jones
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)